### In re BITUMINOUS COAL WAGE AGREEMENTS LITIGATION.

Misc. No. 9604.
MDL 536.

United States District Court,
W.D. Pennsylvania.

Feb. 21, 1984.

David McNeil Olds (argued), Daniel I. Booker, Reed, Smith, Shaw & McClay, Pittsburgh, Pa. for Duquesne Light Co., Associated Electric Coop., Union Carbide Corp. and U.S. Fuel Co.

John L. Kilcullen, Kilcullen, Wilson & Kilcullen, Washington, D.C. for Reitz Coal Co. and Doe Valley Coal Co.

Anthony J. Polito, Corcoran, Hardesty, Ewart, Whyte & Polito, Pittsburgh, Pa. for Consolidation Coal Co., Royalty Smokeless

Coal Co., Shannon Pocahontas Coal Co., Virginia Crews Coal Co., Gilbert Fuel Co., and La Luz Ohio, Inc.

Gregg M. Rosen, Rosen & Mahfood, Pittsburgh, Pa. for Old Home Manor, Inc.

Harry L. Hopkins, Charles C. Pinckney, Lange, Simpson, Robinson & Somerville, Birmingham, Ala. for Pulltight Coal, Inc., Lakeside Coal Co. and Kinlock Coal, Inc.

John W. Latella, Cauley, Conflenti & Latella, Pittsburgh, Pa. for Luzerne Coal Corp.

Jeffrey J. Leech, Tucker Arensberg, Pittsburgh, Pa. for West Newton Coal Logistics.

Stephen J. Pollak, Wendy S. White (argued), Shea & Gardner, Washington, D.C. for the Trustees of the United Mine Workers of America Health and Retirement Funds.

Willard P. Owens (argued), Washington, D.C. for International Union, United Mine Workers of America.

## OPINION

MANSMANN, District Judge.

This matter comes before this Court on Motions for Summary Judgment filed by certain Plaintiffs [1] and Defendants [2] in this multidistrict litigation.[3]

In thirteen of the nineteen cases before this Court,[4] the Plaintiffs are the Trustees ("Trustees") of various pension plans (the "Funds") established by the United Mine Workers of America (the "Union") and have commenced these actions against various coal-producing and/or utilizing corporations (the "Industry") to recover claimed deficiencies in contributions to the Funds. Additionally, in some of these cases, the Union is a Plaintiff-intervenor [5] or a Counterclaim Defendant.[6] The Industry Defendants resisted these claims by asserting, *inter alia,* in their Counterclaims and/or Answers that the provision of the collective bargaining agreements under which the Funds are sought contains a clause which is illegal and unenforceable as it is violative of § 1 of the Sherman Act (15 U.S.C. § 1)

1. Duquesne Light Company ("Duquesne"), C.A. No. 81–870; Harrison Combs, John J. O'Connell and Paul R. Dean, as Trustees of the United Mine Workers of America Health and Retirement Funds, C.A. No. 83–0069; Union Carbide Corporation ("Union Carbide"), C.A. No. 83–2619; Associated Electric Cooperative, Inc. ("Associated"), C.A. No. 83–2626; Royalty Smokeless Coal Company, Inc. ("Royalty"), C.A. No. 83–3211; Virginia Crews Coal Company, Inc. ("Virginia Crews"), C.A. No. 83–3212; and Shannon Pocahontas Mining Company, ("Shannon"), C.A. No. 83–3213. With the exception of the Trustees in C.A. No. 83–0069, all moving Plaintiffs are Industry members.

2. Old Home Manor, Inc. ("Old Home"), C.A. No. 79–1100; Luzerne Coal Corporation, a corporation ("Luzerne"), C.A. No. 80–1804; Duquesne, C.A. No. 81–2255; Gilbert Fuel Co. and LaLuz Ohio, Inc. individually d/b/a Muskingum Mines Joint Venture, a partnership ("Muskingum"), C.A. No. 83–0059; Lakeside Coal Co. ("Lakeside") and Kinlock Coals, Inc. ("Kinlock"), C.A. No. 83–0060; Pulltight Coal, Inc., a corporation ("Pulltight"), C.A. No. 83–0061; Reitz Coal Company ("Reitz"), and Doe Valley Coal Company ("Doe"), C.A. No. 83–0067; Reitz, C.A. No. 83–0068; Consolidation Coal Company ("Consolidation"), C.A. No. 83–0069; Associated, C.A. No. 83–2060; United States Fuel Company ("U.S. Fuel"), C.A. No. 83–2457; West Newton Coal Logistics Company, a corporation ("West Newton"), C.A. No. 83–2761; and Union Carbide, C.A. No. 84–146.

3. Pursuant to the January 10, 1983 Order of the Judicial Panel on Multidistrict Litigation, fifteen actions pending in five districts were centralized for coordinated or consolidated pretrial proceedings. (Eleven cases were transferred from other districts and four were already venued in the Western District of Pennsylvania.) Thereafter, certain cases were discontinued and others were added to those already before this Court, making the current total twenty-one. (Of these cases, nineteen are currently before the Court on Motions for Summary Judgment. Those Industry members which have not moved are Douglas Pocahontas Coal Company, a corporation, C.A. No. 83–0063; and Metco Mining Corporation, a corporation, C.A. No. 83–0064.)

4. C.A. No. 79–1100 (Old Home); C.A. No. 80–1804 (Luzerne); C.A. No. 81–2255 (Duquesne); C.A. No. 83–0059 (Muskingum); C.A. No. 83–0060 (Lakeside and Kinlock); C.A. No. 83–0061 (Pulltight); C.A. No. 83–0067 (Reitz and Doe); C.A. No. 83–0068 (Reitz); C.A. No. 83–0069 (Consolidated); C.A. No. 83–2060 (Associated); C.A. No. 83–2457 (U.S. Fuel); C.A. No. 83–2761 (West Newton) and C.A. No. 84–146 (Union Carbide). For convenience and clarity, when individual cases are mentioned in this Opinion, they shall be referred to by their civil action number and the name of the Industry member party.

5. C.A. No. 83–0067 (Reitz and Doe); C.A. No. 83–0068 (Reitz); and C.A. No. 83–0069 (Consolidated).

6. C.A. No. 83–2060 (Associated) and C.A. No. 84–146 (Union Carbide).

and/or § 8(e) of the National Labor Relations Act (29 U.S.C. § 158(e)).

Article XX, Section (d)(1)(v) of the National Bituminous Coal Wage Agreements ("Wage Agreement") of 1974, 1978 and 1981 contains the clause which is at issue (the "purchased-coal clause").[7] By its terms, the purchased-coal clause sets forth, *inter alia*, that signatory Industry members are to contribute to the Funds whenever coal is purchased for sale or use by the signatory "on which contributions to the appropriate Trusts ... have not been made."

In the remaining six cases before this Court,[8] the Plaintiffs are various members of the Industry which have commenced suits against the Trustees and the Union, alleging that the purchased-coal clause is illegal and unenforceable as it is violative of 15 U.S.C. § 1 and 29 U.S.C. § 158(e). The Defendants in all six of these cases are both the Trustees and the Union.

In each of the cases under consideration, the movants are the Industry members (with one exception).[9] Every Industry movant has applied to this Court for summary judgment contending, *inter alia*, that the purchased-coal clauses in the Wage Agreements of 1974, 1978 and/or 1981 are "union signatory" agreements and illegal under 29 U.S.C. § 158(e).[10] Some Industry movants further contend that the purchased-coal clauses are *per se* violative of

15 U.S.C. § 1 as an unlawful group boycott.[11]

The Industry movants seek declaratory and injunctive relief, *i.e.*, that this Court find the purchased-coal clause to be illegal and unenforceable under 15 U.S.C. § 1 and/or 29 U.S.C. § 158(e) and that this Court permanently enjoin its enforcement. Additionally, of those movants claiming violations of 15 U.S.C. § 1 and 29 U.S.C. § 158(e) and seeking injunctive relief, some have asserted claims for damages in their Complaints or Counterclaims and have sought summary judgment as to liability only.[12]

For the reasons set forth below, the Trustees' motion for summary judgment is denied and the Industry's motions for summary judgment are granted in part and denied in part. More specifically, this Court finds the purchased-coal clause to be violative of 29 U.S.C. § 158(e) and permanently enjoins its enforcement. The Industry movants' applications for summary judgment based on this ground are granted. For the reasons set forth in the Opinion, the Industry's motions for summary judgment based upon the claimed antitrust violations are denied.

\* \* \*

## FACTUAL BACKGROUND

On December 6, 1974, March 27, 1978 and June 6, 1981, the Union, the Bituminous Coal Operators' Association, Inc. and

---

**7.** The purchased-coal clause of the Wage Agreements is identical for the years 1974, 1978 and 1981 and is set forth *infra*.

**8.** C.A. No. 81–870 (Duquesne); C.A. No. 83–2619 (Union Carbide); C.A. No. 83–2626 (Associated); C.A. No. 83–3211 (Royalty); C.A. No. 83–3212 (Virginia Crews); and C.A. No. 83–3213 (Shannon).

**9.** The Trustees in C.A. No. 83–0069 (Consolidation) have moved for summary judgment based upon their claim that Consolidation owes contributions to the Funds. (This motion was made prior to the transfer of this case from the U.S. District Court for the District of Columbia pursuant to the Order of the Judicial Panel on Multi-district Litigation and was held in abeyance.) In that action, Consolidation has also moved for summary judgment.

**10.** Certain Industry movants have based their motion on this ground alone: Muskingum (C.A. No. 83–0059); Lakeside and Kinlock (C.A. No. 0060); Pulltight (C.A. No. 83–0061); and Consolidation (C.A. No. 83–0069).

**11.** Old Home (C.A. No. 79–1100); Luzerne (C.A. No. 80–1804); Duquesne (C.A. Nos. 81–870 and 81–2255); Reitz (C.A. Nos. 83–0067 and 83–0068); Doe (C.A. No. 83–0067); Associated (C.A. Nos. 83–2060 and 83–2626); U.S. Fuel (C.A. No. 83–2457); Union Carbide (C.A. Nos. 83–2619 and 84–146); West Newton (C.A. No. 83–2761); Royalty (C.A. No. 83–3211); Virginia Crews (C.A. No. 83–3212); and Shannon (C.A. No. 83–3213).

**12.** Duquesne (C.A. No. 81–870) and Associated (C.A. Nos. 83–2060 and 83–2626).

others entered into collective bargaining agreements, the National Bituminous Coal Wage Agreements of 1974,[13] 1978 [14] and 1981,[15] respectively.

Included in the Wage Agreements of 1974, 1978 and 1981 is the purchased-coal clause, Article XX, section (d)(1)(v), which provides in pertinent part as follows:

> In addition to the contributions indicated above, during the life of the Agreement, each signatory Employer shall, for the periods of time indicated below, contribute to the Trusts established in this Article in the amounts shown below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal after production by another operator, procured or acquired by such Employer for use or for sale on which contributions to the appropriate Trusts as provided for in this Article have not been made (amounts shown below include cents per hour worked contributions converted to tonnage equivalents).

Pursuant to the purchased-coal clause of the Wage Agreements of 1974, 1978 and

1981, each "Employer" [16] (Industry signatory) was required to make contributions to the Funds based on the amount of coal *produced* by the signatory. Additionally, each Industry signatory was required to make contributions to the Funds based upon the amount of coal *purchased* for sale or use by the signatory "on which contributions to the appropriate Trusts ... have not been made." [17] Thus, any coal purchased from a non-signatory (nonunion producer) would appear to obligate the Industry signatory to contribute specified amounts to the appropriate Funds.

A common pattern emanating from each of the cases before this Court is that the Industry signatories made contributions to the Funds with respect to coal they *produced* but did not make contributions to the Funds with respect to coal which they *purchased.* The instant controversy centers entirely around this distinction as it relates to the purchased-coal clause.

These actions commonly arise under and jurisdiction is predicated upon § 301 of the

---

**13.** The Wage Agreement of 1974 is at issue in the following cases: C.A. No. 79–1100 (Old Home); C.A. No. 80–1804 (Luzerne); C.A. No. 81–870 (Duquesne); C.A. No. 81–2255 (Duquesne); C.A. No. 83–0060 (Lakeside and Kinlock); C.A. No. 83–0067 (Reitz and Doe); C.A. No. 83–2619 (Union Carbide); and C.A. No. 84–146 (Union Carbide).

**14.** The Wage Agreement of 1978 is at issue in the following cases: C.A. No. 79–1100 (Old Home); C.A. No. 80–1804 (Luzerne); C.A. No. 81–870 (Duquesne); C.A. No. 81–2255 (Duquesne); C.A. No. 83–0059 (Muskingum); C.A. No. 83–0060 (Lakeside and Kinlock); C.A. No. 83–0061 (Pulltight); C.A. No. 83–0068 (Reitz); C.A. No. 83–0069 (Consolidated); C.A. No. 83–2060 (Associated); C.A. No. 83–2619 (Union Carbide); C.A. No. 83–2626 (Associated); C.A. No. 83–3211 (Royalty); C.A. No. 83–3212 (Virginia Crews); and C.A. No. 83–3213 (Shannon); and C.A. No. 84–146 (Union Carbide).

**15.** The Wage Agreement of 1981 is at issue in the following cases: C.A. No. 83–2060 (Associated); C.A. No. 83–2457 (U.S. Fuel); C.A. No. 83–2619 (Union Carbide); C.A. No. 83–2626 (Associated); C.A. No. 83–2761 (West Newton); C.A. No. 83–3211 (Royalty); C.A. No. 83–3212 (Virginia Crews); C.A. No. 83–3213 (Shannon); and C.A. No. 84–146 (Union Carbide).

**16.** "Employer", as used in the 1974, 1978 and 1981 Wage Agreements, is synonymous with Industry signatory. The 1950 and 1974 Union Pension Plans administered by the Trustees were incorporated into each of the three Wage Agreements: the 1974 Wage Agreement (incorporating the 1950 and 1974 plans, effective December 6, 1974); the 1978 Wage Agreement (incorporating the 1950 and 1974 plans, as amended March 27, 1978); and the 1981 Wage Agreement (incorporating the 1950 and 1974 plans, as amended June 7, 1981). Article I, section A(2) of the 1950 and 1974 Union Pension Plans provides:

> "Employer" means an employer who is signatory to the Wage Agreement or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

**17.** Moreover, pursuant to the terms of the 1950 and 1974 Union Pension Plans, (Article V, Section B(8)), only "Employers" were permitted to contribute to the Funds:

> Contributions to the [1950 or 1974] Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX [of the Wage Agreement in effect at the time].

Labor Management Act, 29 U.S.C. § 185 [18] and §§ 502 and 515 of the Employee Retirement Income Security Act of 1974, ("ERISA") as amended, 29 U.S.C. §§ 1132 [19] and 1145. [20]

\*　　\*　　\*　　\*　　\*　　\*

Under FED.R.CIV.P. 56, summary judgment may be entered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Continental Ins. Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982) (citations omitted). The U.S. Court of Appeals for the Third Circuit has made clear that any doubts as to the existence of genuine issues of fact are to be resolved against the moving parties. Further, the facts and inferences to be drawn must be viewed in the light most favorable to the party opposing the motion. *Continental Ins. Co. v. Bodie,* 682 F.2d 436 (3d Cir.1982).

\*　　\*　　\*

## THE NATIONAL LABOR RELATIONS ACT

It is the contention of the Industry movants that the purchased-coal clause in the 1974, 1978 and 1981 Wage Agreements [21]

violates § 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(e) which provides in pertinent part as follows:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void...

The Industry members assert that the illegality of the purchased-coal clause stems from the fact that it is not "primary" in objective, *i.e.,* is not addressed to labor relations between individual employers and its employees. Thus, the Industry contends, the clause, on its face, is "secondary" and "union signatory" as it seeks to benefit all union members rather than the members of the individual "work units." (The "work unit", the Industry asserts, properly encompasses the individual em-

---

**18.** 29 U.S.C. § 185 reads in pertinent part as follows:

(c) For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members.

**19.** 29 U.S.C. § 1132 reads in pertinent part as follows:

(e)(1) Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section.

(2) Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

**20.** 29 U.S.C. § 1145 reads as follows:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

**21.** Since the clause under consideration is identical in all three agreements, we need not distinguish them. *See* footnotes "13", "14" and "15", *supra.*

ployers' employees and does not extend to all union members.)[22]

Moreover, the Industry members contend that the clause is not redeemed because it does not serve any legitimate "primary" objective, *i.e.*, "work preservation" or "union standards."

The Industry members also claim that a penalty is placed on the purchase of all coal from non-signatories, which they claim discriminates against this group and also penalizes the Industry member signatory.[23] Furthermore, the Industry claims that the 1950 and the 1974 Pension Plans (which have been incorporated into each of the Wage Agreements), state that contributions to the Funds may only be made by an "employer", who is defined therein as a signatory to the Wage Agreement.[24] Thus, according to the Industry, even if a non-signatory wished to make a contribution to the Funds, it would be precluded from doing so by the restrictions drafted by the Union into the pension plans.

The Trustees and the Union resist the instant motions primarily on the basis that there are disputes as to material issues of fact which they claim would preclude the granting of summary judgment. The Trustees and the Union contend, *inter alia*, that the following are in dispute: (1) the purpose and effect of the purchased-coal clause; (2) the labor costs of signatories as opposed to non-signatories; (3) the relationship of labor costs of signatories and non-signatories *vis-a-vis* the 1974, 1978 and 1981 Wage Agreements; and (4) the relevant "work unit."

The Union and the Trustees also assert that the appropriate "work unit" is the bargaining unit, a nationwide unit, or at least that which includes the Bituminous Coal Operators Association, and not that of the individual employers. Further, at oral argument counsel for the Union argued that the Union is unique because it has a nationwide contract. Therefore, the Union and the Trustees contend that all the employees covered by the one contract are the employees who comprise the "work unit" and it is their work that this clause seeks to protect. Thus, the Union and Trustees admit that the "work unit", for the purpose of the purchased-coal clause, goes beyond individual employer-employee units.[25]

**22.** Additionally, we note that Pulltight (C.A. No. 83–0061) in its memorandum in support of its motion for partial summary judgment states that although it signed the Wage Agreement of 1978, it is not a member of any multi-employer bargaining group. It is Pulltight's argument that it is atypical of the employers involved in this litigation because its business does not involve the mining of coal. Instead, Pulltight claims that it operates a coal preparation facility. Pulltight asserts that because its employees mine no coal, the purchased-coal clause cannot "preserve work", nor can it serve as a "union standards" clause for the same reason. The Trustees counter this by claiming that there is a factual dispute as to whether Pulltight is only a processor. However, counsel conceded that it was possible that coal processors who have Union employees would be covered by this agreement. Because the work unit extends beyond any individual employer, the Trustees argue that even if such a company were found, that fact would not make the purchased-coal clause "secondary" in objective. However, in light of the holding of this Opinion, these arguments need not be addressed.

**23.** At oral argument, counsel for the Trustees, in presenting its contention regarding the cost differentials in purchasing coal from non-signatories compared to coal produced by Union members, claimed that the royalty does not impose a penalty on non-signatories. The basis of this argument is that the royalty serves to equalize the difference between union labor costs and nonunion labor costs. The Trustees claim the royalty serves as an equalizer and not as a penalty, and that it performs the work of a "union standards" clause.

**24.** *See* footnote "16", *supra.*

**25.** Additionally, at oral argument, the Trustees argued that even if a non-signatory were to provide the identical wages and benefits offered by the signatory, the costs of these benefits to the non-signatory would still be substantially less than the cost of these benefits to the signatories. It is alleged by the Trustees that the Union has been offering substantial pension benefits to more than 85,000 retired miners. The burden of paying for these substantial pensions falls upon an ever-decreasing number of employed unionized miners. Counsel for the Trustees admitted that *signatories are paying into the Pension Fund not only for their own employees, but also for a large number of pensioners who may never have worked for that signatory.* When asked by the Court if counsel were stating that the purpose of the clause was

Additionally, the Trustees and the Union assert: that the Union had a lawful objective in negotiating the purchased-coal clause; that the proper "work unit" is not always a single employer; and that the appropriate "work preservation" unit is the "contract-wide" unit. Further, they submit that changes in federal law, *i.e.*, the enactment of ERISA (29 U.S.C. §§ 1001, *et seq.*), support the legality of a "contract-wide" "work unit."

The Trustees and the Union also contend that the work standards of the Industry generally must be considered, since they allege that non-signatories generally have substandard wages, benefits and conditions.

In connection with the appropriate "work unit", the Industry argues that the purchased-coal clause reaches beyond the "work unit" of any single employer and creates a "work unit" which is Industry-wide. As set forth above, the nationwide scope of the "work unit" is not disputed by the Trustees and the Union. The Industry further contends that no case has ever held that a "work unit" encapsulates the entire industry.

The Trustees and the Union further argue that determination of these motions cannot be made at this stage in light of *National Woodwork Manufacturers Association v. N.L.R.B.*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967) and its requirement for an "inquiry into ... all the surrounding circumstances." *Id.* at 644, 87 S.Ct. at 1268. Conversely, the Industry contends that this Court can and should determine summarily that the purchased-coal clause is "secondary" and "union signatory" and therefore violative of § 8(e) of the NLRA as the "work unit" cannot be deemed to be nationwide.

Thus, the immediate issues before this Court are whether the purchased-coal clause is "primary" or "secondary" in objective and whether such a determination requires a factual inquiry which would preclude summary judgment. With respect to the latter, we find that for purposes of the summary judgment motions before this Court, that the record is sufficient, as the facts relied upon by this Court are undisputed.

\* \* \*

■ Pursuant to § 8(e) of the NLRA, any agreement by which an employer agrees to cease doing business with another employer or person is an unfair labor practice and, therefore, "unenforceable and void." Such agreements are also referred to as "hot-cargo" agreements due to their genesis in the trucking industry. Section 8(e), the "hot-cargo" provision, was enacted to correct a loophole created by *Carpenters' Union v. N.L.R.B.*, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958) ("*Sand Door* "), which held that such an agreement was not *per se* illegal. Thus, notwithstanding the wording of the statute, not all "hot-cargo" agreements are "unenforceable and void"; the "hot-cargo" provision only prohibits "secondary" aims. "Primary" objectives, *e.g.*, "work preservation", are not prohibited by the provision. *National Woodwork Association v. N.L.R.B.*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). In distinguishing between the two, "[t]he touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-a-vis* his own employees." *N.L.R.B. v. International Longshoremen's Association*, 447 U.S. 490, 504, 100 S.Ct. 2305, 2313, 65 L.Ed.2d 289 (1980), quoting *National Woodwork Association v. N.L.R.B.*, *supra*, 386 U.S. at 645, 87 S.Ct. at 1268 and omitting footnote.

■ Therefore, in order for a clause to be construed as "primary" and not be prohibited by § 8(e) of the NLRA, it must benefit members of the relevant "work

---

to benefit the Union Pension Fund rather than the Union employees of Duquesne, counsel responded that the clause was designed to protect the pensions that the Union negotiated for Duquesne's employees and, additionally for the employees of all of the companies who are involved in this litigation. (The Union later attempted to qualify this argument of the Trustees by stating that the purpose of the clause was not for the benefit of the pensioners.)

unit" and not the union membership as a whole. *Amax Coal Co. v. N.L.R.B.*, 614 F.2d 872 (3d Cir.1980) *rev'd on other grounds*, 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981).

In *Riverton Coal Co. v. United Mine Workers of America*, 453 F.2d 1035 (6th Cir.1972), *cert. denied*, 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972), the clause of the collective bargaining agreement requiring payment by employers of eighty cents into the union's welfare and retirement fund for each ton of coal for which the forty-cent royalty "had not been paid into said Fund", (*i.e.*, when coal was purchased from a non-signatory operator),[26] was found to be "secondary" and therefore violative of § 8(e) of the NLRA.[27] In so holding, the U.S. Court of Appeals for the Sixth Circuit stated:

> The eighty cent penalty clause was not directed at job security, because Riverton could comply therewith by closing its mines, discharging all of its employees, and filling its entire requirements with coal from other signatory mines. Furthermore, Riverton could purchase coal from a signatory mine supplier whose employees were operating under substandard wages and working conditions.

> The trouble is that the clauses in question here were not 'addressed to the labor relations of the contracting employer [Riverton] vis-a-vis his own employees', but on the contrary, to the boycotted employers (non-signatory suppliers).

**26.** This clause is considered the predecessor to the purchased-coal clause. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982).

**27.** The Trustees and the Union argue that Riverton was wrongly decided and should be disregarded by this Court. The basis of their argument is that if the Riverton Court was correct in its analysis of the work preservation issue, a signatory could close its own mines and purchase all its coal from another signatory. Therefore there could be no "union standards" clause because any such clause would not allow a company to "shut down." Furthermore, the Trustees argue that the Riverton Court was incorrect when it stated that the company could purchase coal from a signatory whose wages and working conditions were substandard. Ac-

*Id.* at 1040–1041, citing *National Woodwork Manufacturers Association v. N.L.R.B.*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

A "union standards" clause has a "primary" objective and is legal, but a "union signatory" clause has a "secondary" objective and is therefore illegal under § 8(e) of the NLRA. Further, a "union standards" clause serves to restrict certain transactions with nonunion employers unless they "observe certain pay scales and conditions of employment." *N.L.R.B. v. National Maritime Union of America*, 486 F.2d 907, 912 (2d Cir.1973), *cert. denied* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). *See also Truck Drivers Union Local No. 413 v. N.L.R.B.*, 334 F.2d 539 (D.C. Cir.1964), *cert. denied*, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964). However, a clause will be deemed a "union signatory" clause when "the union has an interest, independent of the interests of the employees being represented, in furthering its own organizational ends or in protecting the interests of its other bargaining units." *N.L.R.B. v. National Maritime Union of America, supra*, 486 F.2d at 913. Therefore, a clause which goes beyond the signatory employer and attempts to deal with a union's differences with a non-signatory is "secondary" and therefore illegal under § 8(e) of the NLRA. *See, e.g., Local 644, United Brotherhood of Carpenters and Joiners of America v. N.L.R.B.*, 533 F.2d 1136 (D.C.Cir.1976).

cording to the Trustees, all signatories have the same standards. Finally, the Trustees contend that the Riverton Court found as a matter of fact that Riverton (a single employer) was the appropriate work unit and that Riverton was only buying supplemental coal. The same findings cannot be made by this Court on the record at this stage, according to the Trustees and the Union. Instead, they urge this Court to follow *International Union, U.M.W.A. (Dixie Mining Co.)*, 188 N.L.R.B. 753 (1971) which held the same eighty-cent clause to be permissible under § 8(e) of the NLRA as a "union standards" clause. In this connection, we note that in *Kaiser v. Mullins*, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), the Supreme Court failed to mention Dixie Mining and cited Riverton authoritatively.

Thus, a multi-employer bargaining unit may not claim that a clause is "primary" and a "work preservation" clause because it preserves the work of the entire multi-employer bargaining unit. If such clauses were considered "primary", the prohibition of the § 8(e) of the NLRA would then become the rule. *Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. N.L.R.B.*, 654 F.2d 1301 (9th Cir.1981), *aff'd in part, vacated in part sub nom., Woelke & Romero Framing, Inc. v. N.L.R.B.*, 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982). *But see, Plumbers & Steamfitters Local 342 v. N.L.R.B.*, 598 F.2d 216 (D.C. Cir.1979). Further, even if an objective of the union is to preserve work for the employees of individual operators, when another objective is to benefit the union members generally, the clause becomes "secondary." *Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. N.L.R.B., supra* 654 F.2d at 1308.

Therefore, a clause will be construed as "secondary" and will be prohibited by § 8(e) of the NLRA if it is found to be "union signatory", *i.e.*, if it seeks to benefit the union as a whole, rather than the individual employer's employees. *See e.g., Amax Coal Co. v. N.L.R.B.*, 614 F.2d 872 (3d Cir.1980), *rev'd on other grounds*, 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981). In *Amax*, the U.S. Court of Appeals for the Third Circuit, in reviewing an order of the NLRB, upheld, *inter alia*, the Board's finding that the "construction clause" in the contract violated § 8(e). The clause, in regard to the "construction of mine or mine related facilities" permitted the employer to utilize "outside contractors" of its choice only when "UMWA contractors qualified to do the work are not available." *Id.* at 888. The *Amax* Court held that the clause was "union signatory" and therefore violated § 8(e) of the NLRA:

> This clause prohibits Amax from subcontracting to a non-UMWA subcontractor even if he maintains working conditions equivalent to Amax's. It only serves the Union's own interest in making sure the subcontractor recognizes the Union, and does not provide any benefit to Amax's employees.

*Id.* at 888.

\* \* \*

After careful consideration of the numerous arguments raised by all parties, this Court finds the purchased-coal clause to be a "union signatory" clause, and as such, violative of § 8(e) of the NLRA. The impact of the purchased-coal clause reaches beyond any case-defined "work unit", *i.e.*, single employer, and seeks to benefit all Union members. The intended reach of the purchased-coal clause is not disputed. The Trustees and the Union readily admit its nationwide scope. Since the purchased-coal clause is not, as mandated by *National Woodwork*, "addressed to the labor relations of the contracting employer *vis-a-vis* his own employees", it is illegal as it is "union signatory."

Additionally, this Court does not find any "primary" objectives, *i.e.*, "work preservation" or "union standards" in connection with the purchased-coal clause which would serve to make it permissible under § 8(e) of the NLRA. As set forth above, the appropriate "work unit" is the individual Industry member's employees, not all Union members. Moreover, the purchased-coal clause is not directed at "work preservation" because each Industry member "could comply therewith by closing its mines, discharging all of its employees, and filling its entire requirements with coal from other signatory mines." *Riverton Coal Co. v. U.M.W.A.*, 453 F.2d 1035, 1040–1041 (6th Cir.1972), *cert. denied*, 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972).

Moreover, if this Court were to define the "work unit" at issue as a nationwide one, this would effectively make "secondary" objectives, *i.e.*, "union signatory" agreements, permissible under § 8(e) of the NLRA rather than prohibited. This would totally emasculate the statute. Further, assuming *arguendo* that this Court found the purchased-coal clause to be "work preservational" *vis-a-vis* employees of individual employers, clearly the Union's intent to

benefit its members generally makes the clause "secondary." However, as noted above, the Court does not even find the clause "work preservational" as it is not directed at the appropriate "work unit."

■ Additionally, this Court does not find that the purchased-coal clause is a "union standards" clause. This clause imposes a penalty on all coal purchased from any non-signatory. It imposes this penalty indiscriminately in connection with the purchase of coal from any non-signatory without taking into account that the non-Union operator may have the same or better working conditions. "If [the purchased-coal clause] is illegal under the antitrust or the labor laws, it is because of the financial burden which the agreement attached to purchases of coal from non-UMW producers, even though they may have contributed to other employee welfare funds." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 79, 102 S.Ct. 851, 857, 70 L.Ed.2d 833 (1982).

Accordingly, the Industry members' motions for summary judgment are granted. Since the purchased-coal clause is violative of § 8(e) of the NLRA, it is unenforceable and void. Therefore, its enforcement is permanently enjoined.

With respect to those Industry members which are Plaintiffs,[28] summary judgment is granted in their favor and any and all Counterclaims against them seeking enforcement of the purchased-coal clause and contributions to the Funds are dismissed. In connection with those Industry members which are Defendants,[29] judgment on their respective Counterclaims and/or Affirmative Defenses is granted, and the respective actions against them are dismissed.

28. *See* footnote "1", *supra.*

29. *See* footnote "2", *supra.*

30. *See* footnote "12", *supra.*

31. In conformity with this Court's holding with respect to § 8(e) of the NLRA, the antitrust portion of this Opinion applies only to those Industry movants who have asserted claims for antitrust damages. (Since this Court has already enjoined the enforcement of the pur-

We note that two of the Industry member Plaintiffs and one Industry member Defendant also seek damages on both the § 8(e) and the antitrust claim.[30] With respect to them, § 8(e) damages, if even appropriate, will not be considered at this juncture.

\*　　\*　　\*

## THE SHERMAN ACT

It is also the contention of certain Industry movants[31] that the purchased-coal clause contained in the 1974, 1978 and 1981 Wage Agreements violates § 1 of the Sherman Act, 15 U.S.C. § 1 which provides as follows:

> Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

The Industry movants contend that summary judgment is appropriate in certain antitrust cases, particularly when a *per se* violation has occurred, which they claim has transpired here. In this regard, they state that the holding of *Consolidated Express, Inc. v. New York Shipping Association, Inc.*, 602 F.2d 494 (3d Cir.1979) (*"Conex I"*), *vacated and remanded on other grounds,* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980), *on remand,* 641 F.2d 90 (3d Cir.1981) (*"Conex II"*), mandates a

chased-coal clause, based upon its violation of § 8(e) of the NLRA, it will not consider the Industry movants' application for an injunction based on claimed violations of the Sherman Act.) Therefore, for the purposes of the antitrust portion of this Opinion, the term "Industry" movants refers solely to Duquesne (C.A. No. 81–870) and Associated (C.A. Nos. 83–2060 and 83–2626).

*per se* finding. The Industry movants further contend that, in any event, the Trustees and the Union are not entitled to a labor exemption, citing *Connell Construction Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). Additionally, they assert that neither of the two required labor exemption tests set forth in *Conex I* are met here.

The Industry movants also claim that the purchased-coal clause, on its face, is an illegal group boycott, and as such, is *per se* violative of the antitrust laws. More particularly, they assert that the clause is an agreement among Union operators and the Union to deal with nonunion operators only on unfavorable terms, citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) and *Conex I, supra*, 602 F.2d 494. Further, in reply to the arguments of the Union and the Trustees, the Industry submits that a rule of reason analysis is unwarranted here, as they claim that *Conex I, supra*, 602 F.2d 494, mandates the conclusion that the purchased-coal clause is a *per se* violation. Therefore, the Industry movants contend that they are entitled to injunctive relief [32] and damages.

Conversely, the Union and the Trustees assert that if the purchased-coal clause is found to be violative of § 8(e) of the NLRA, this does not preclude the availability of the labor exemption to the antitrust laws. In this connection, the Union further asserts that the purchased-coal clause is exempt from the antitrust laws irrespective of its legality under § 8(e) of the NLRA. The Union argues that it is entitled to both a statutory and a non-statutory exemption. The Union claims, with respect to the latter, that the purchased-coal clause encompasses a mandatory subject of collective bargaining, as it asserts that "the Funds are really another form of compensation to the employees." The Trustees, on the other hand, concede the unavailability of the statutory exemption. However, they do claim that the non-statutory exemption is available, basically for the same reasons asserted by the Union.

Additionally, both the Union and the Trustees claim that summary judgment is inappropriate because there has been no *per se* violation of the Sherman Act. Therefore, they claim, the appropriate analysis utilizing the rule of reason standard would preclude summary judgment due to the factually insufficient record. In any event, the rule of reason analysis, they contend, would prove the purchased-coal clause to be a reasonable restraint of trade. The Union further claims that the Industry has not demonstrated that it has sustained "injury in fact."

\* \* \*

There are a number of statutory sources which exempt organized labor from the federal antitrust laws: §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, and the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105 and 113. These statutes declare that labor unions are not "illegal combinations or conspiracies in restraint of trade, under the antitrust laws." 15 U.S.C. § 17.

Additionally, secondary picketing and boycotts are also exempt from the antitrust laws. *Connell Construction Co., Inc. v. Plumbers & Steamfitters Local No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). However, these exemptions apply only to unilateral activity on the part of a union. The statutory exemption does not shield a labor union from the antitrust laws when it engages in a conspiracy with a nonlabor organization. *Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). Moreover, all exemptions from the antitrust laws are to be narrowly construed by the courts. *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979).

---

**32.** As set forth *supra* at footnote "31", this Court will not address the claims for injunctive relief based upon alleged antitrust violations.

■ Since the Union's activity is not unilateral, this Court concludes that the Union is not entitled to a statutory exemption.

■ In addition to the statutory exemptions, labor unions, under the proper circumstances, are entitled to a judicially-created non-statutory exemption.

The U.S. Court of Appeals for the Third Circuit in *Conex I, supra,* 602 F.2d 494, in discussing the non-statutory exemptions, restated the two basic principles originally articulated by the Supreme Court in *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940):

First, the rationale of the exemption is protection of the union's power to eliminate competition in the labor market over wages and working conditions. Restraints operating on that primary market are presumptively outside the scope of the Sherman Act. Second, restraints, like those in *Duplex Printing Co.* and *Bedford Cut Stone* [33] which are aimed at controlling a secondary product or service market are suspect, and are presumptively covered by the Sherman Act.

602 F.2d at 514.

Further, in its analysis of the non-statutory exemption, the Supreme Court established the boundaries of that exemption in *Connell Construction Co., Inc. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). Connell, a general contractor, subcontracted plumbing and mechanical work on the basis of competitive bids. Its employees, represented by building trade unions, were not represented by Local 100. However, Local 100 asked Connell to enter into an agreement whereby it would subcontract work only to those groups which had a contract with Local 100. Upon Connell's refusal to enter into such an agreement, Local 100 picketed one of Connell's construction sites. After some of its employees walked off the job, Connell filed a suit, alleging, *inter alia,* that the agreement violated § 1 of the Sherman Act.

In reversing the decisions of the district court and of the Court of Appeals for the Fifth Circuit, the Supreme Court held that the union was not exempt from the antitrust laws. The *Connell* Court found that Local 100 implemented its goal of organizing subcontractors by imposing direct restraints on the market and held that the agreement between Connell and Local 100 resulted in the exclusion of non-signatories from the market, notwithstanding that their competitive advantage may have been the result of efficient operations rather than substandard wages and working conditions. In so doing, the Court stated: "[l]abor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members." *Id.* at 622, 95 S.Ct. at 1835. Additionally, the *Connell* Court stressed that the elimination of competition derived from efficient methods was not a goal of federal labor policy and, rather, was precisely what the antitrust laws were designed to prevent.

Similarly, the *Conex I* Court also noted the limited application of a non-statutory exemption: "[t]hus §§ 8(b)(4) and 8(e) reinforce rather than conflict with the basic policy of the antitrust laws, and suggest a cautious approach to the recognition of a nonstatutory antitrust exemption for conduct in violation of their prohibitions." 602 F.2d at 513 (footnote omitted).

While noting its limited availability, the *Conex I* Court established a separate test in connection with the exemption when money damages are sought. Specifically, when money damages are sought, in order to be successful in claiming this exemption, the Trustees and the Union must demonstrate that "at the time they acted ... they could not reasonably have foreseen the subject matter of the agreement being

---

**33.** *Duplex Printing Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921) involved a secondary boycott. *Bedford Cut Stone Co. v. Journeyman Stone Cutters' Association,* 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916 (1927), involved a refusal to handle the primary's product.

challenged would be held to be unlawful under ... § 8(e)."[34] 602 F.2d at 521.

In this connection, the Industry claims that under the initial part of the *Conex I* test, it was reasonably foreseeable that the purchased-coal clause would be held to be violative of § 8(e). Their argument is based in part on *Riverton Coal Co. v. United Mine Workers of America*, 453 F.2d 1035 (6th Cir.1972), *cert. denied*, 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972), which was decided in 1972, two years before the 1974 Wage Agreement became effective. Similarly, the Trustees and the Union have consistently maintained that the purchased-coal clause is a direct descendant of the eighty-cent clause, but instead rely on *International Union, U.M. W.A. (Dixie Mining Co.)*, 188 N.L.R.B. 753 (1971), which upheld the eighty-cent clause.

For the reasons set forth in the preceding portion of the Opinion, this Court declines to follow the *Dixie Mining* case. Furthermore, we note that in all three agreements, a contingency clause was included in Article XX. Each clause provides that if the purchased-coal clause is determined either "invalid" or "in violation of the National Labor Relations Act", the Union shall have the option to renegotiate for a replacement clause, if such determination is not appealable.[35] Concerning this very point, the Court of Appeals for the D.C. Circuit noted that the question of illegality of the purchased-coal clause had been foreseen by the parties: "[t]he terms of the 1974 Agreement clearly indicate that the parties were concerned about the legality of the purchase-of-coal clause and about having their bargained-for agreement undone by subsequent legal rulings on that point." *Mullins v. Kaiser Steel Corp.*, 642 F.2d 1302, 1306 (D.C.Cir.1980), *reversed and remanded*, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982).

In light of the *Riverton* decision rendering the eighty-cent clause violative of § 8(e) of the NLRA and the existence of a "savings clause" in each of the Wage Agreements, any assertions by the Union and the Trustees that it was not reasonably foreseeable that the purchased-coal clause would subsequently be declared illegal, are, at best, disingenuous. Therefore, this Court finds that the Union and the Trustees have not met the foreseeability requirement of the *Conex I* test concerning claims for damages under the antitrust law. It is therefore unnecessary to address the second part of the test. Accordingly, this Court concludes that the Union is not entitled to the non-statutory exemption.

Once a court has made the determination that the non-statutory labor exemption is inapplicable to a given factual situation, it must then apply traditional antitrust law. *Conex I, supra*, 602 F.2d at 522. *See also, Larry V. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council*, 670 F.2d 421 (3d Cir.1982), *cert. denied*, 456 U.S. 1005, 102 S.Ct. 2294, 73 L.Ed.2d 1299 (1982) (*"Muko II"*). As a general rule, a

---

**34.** However, a successful showing that it could not have been foreseen that the agreement would violate § 8(e) does not automatically entitle the party to the exemption. "[The Union] must also demonstrate that the contract provisions and steps taken to implement them were 'intimately related' to the object of collective bargaining thought at the time to be legitimate, and went no further in imposing restraint in the secondary market than was reasonably necessary to accomplish it." 602 F.2d at 521.

**35.** The 1974, 1978 and 1981 Wage Agreements each contain a "savings clause" which provides in pertinent part as follows:

The parties hereto mutually agree that, if at any time during the term of this Agreement a court or tribunal of competent jurisdiction determines by final decision that is not appealable that the provision appearing in paragraph (v) just preceding is invalid or in violation of the National Labor Relations Act, 1947, as amended, or other Federal or state law, the parties shall, at the option of and upon demand by the Union without affecting the integrity of any other provision of this Section or any other provision of the National Bituminous Coal Wage Agreement, meet and engage in good faith negotiations to agree upon a clause to be inserted into this Agreement in replacement of the provision found invalid or unlawful.

court will apply the rule of reason standard, but the *per se* rule applies in appropriate cases and obviates the need for an extensive analysis. *Muko II, supra,* 670 F.2d at 428. This Court must therefore determine at the outset whether the purchased-coal clause constitutes a *per se* violation of the antitrust laws.

In this connection, the Industry members claim that the purchased-coal clause is illegal *per se* under the antitrust laws as it constituted an unlawful group boycott which they claim was an agreement among Union operators and the Union to transact business with another group, *i.e.,* nonunion operators, only on unfavorable terms. Additionally, the Industry asserts that the agreement, in order to be classified as a group boycott, need not encompass a total prohibition against transactions with the boycotted parties, but only an agreement to deal unequally or unfavorably with them, citing *Montague & Co. v. Lowry,* 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608 (1904) and *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Further, the Industry members contend that *Conex I* mandates a *per se* finding as they claim the court held that if the particular provision of the collective bargaining agreement is illegal under the labor laws, it is a *per se* violation of the antitrust laws. Conversely, the Trustees and the Union urge that the finding of a violation of § 8(e) of the NLRA does not necessarily lead to the finding of a *per se* violation of the antitrust laws, citing *Muko II, supra,* 670 F.2d 421.

■ Contrary to the contentions of the Industry members, this Court finds that *Conex I, supra,* 602 F.2d 494, does not mandate the finding of a *per se* antitrust violation after a § 8(e) violation of the labor laws has been found.

However, the *Conex I* Court set forth the situations in which group boycotts traditionally have been held to be *per se* violations of the Sherman Act:

(1) horizontal combinations of traders at one level of distribution having the purpose of excluding direct competitors

from the market ... (2) vertical combinations, designed to exclude from the market direct competitors of some members of the combination ... (3) coercive combinations aimed at influencing the trade practices of boycott victims....

*Id.* at 522 (citations omitted).

The *Conex I* Court then concluded that the conduct at issue had "horizontal, vertical and coercive aspects" and constituted an agreement *to exclude totally all competition. Id.* at 522. Because of the obvious and clear anticompetitive aspects of the *Conex I* facts, the Court found a *per se* violation and eliminated the need for an "elaborate study." *Id.* at 523.

In *Muko II, supra,* 670 F.2d 421, the U.S. Court of Appeals for the Third Circuit provided some additional guidance for the district court in determining what union conduct should be classified a *per se* violation of the Sherman Act. In *Muko II, supra,* 670 F.2d 421, although the plaintiff claimed that the union's agreement with a third party to utilize only union labor was a group boycott, and as such, was *per se* violative of the antitrust laws, this assertion was rejected by the Court. However, it noted that the involvement of a labor union "in an otherwise illegal combination should not preclude a determination that, in appropriate circumstances, the conduct is unreasonable *per se*", and stated that its application in the labor context must not be "mechanical or imprudent." *Id.* at 426 (citation omitted). The Court also rejected the contention of the plaintiff that the *per se* standard applies whenever the union fails to obtain the labor exemption or whenever an 8(e) violation is found.

■ Similarly, this Court rejects the Industry's contentions; we do not find that a *per se* violation has occurred based on either of these grounds. Instead, this Court must examine the conduct and decide if a *per se* finding is warranted.

Although the *Muko II* Court upheld the application of the rule of reason by the district court, it articulated the traditional antitrust principles a court uses to deter-

mine whether the questioned conduct is violative of the antitrust laws and what analysis should be applied:

> In most cases, a "rule of reason analysis" requires a detailed examination of the affected business and the nature of the restraint imposed. There are, however, "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use"... Such determinations of *per se* illegality are not casually made ... "it is only after considerable experience with certain business relationships that courts classify them as *per se*, violations of the Sherman Act" ... Neither mere speculation, nor the desire to simplify the cumbersome process of determining antitrust illegality, is enough to justify the imposition of a *per se* rule.

*Id.* at 428 (footnotes and citations omitted).

Moreover, although group boycotts initially appeared to be labeled by courts as *per se* violations, "the application of the *per se* rule has been limited to those 'classic' boycotts in which a group of business competitors seek to benefit economically by excluding other competitors from the marketplace." *Id.* at 429 (footnote omitted). *See also, DeFilippo v. Ford Motor Co.,* 516 F.2d 1313 (3d Cir.1975), *cert. denied,* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975).

In this regard, the *Muko II* Court held that the agreement by the labor union and a fast food chain not to use nonunion contractors was not a *per se* violation of the antitrust laws as it was not a "classic" group boycott. Given the guidelines of *Muko II, supra,* 670 F.2d 421, this Court similarly does not find that the purchased-coal clause, which attached a financial penalty to coal purchased from nonunion producers, to be a "classic" group boycott or therefore a *per se* violation, as it is not:

> an effort to exclude or cause disadvantage to one or more competitors by cutting them off from trade relationships which are necessary to any firm trying to compete. The classic boycott ... also usually entails an effort to induce two or more suppliers or customers not to deal with firms being excluded from the protected level.

*Muko II, supra,* 670 F.2d at 429–430, citing L. Sullivan, *Handbook of the Law of Antitrust* 260 (1977).

Since we do not find that the Union committed a *per se* violation of the antitrust laws, it is necessary to apply a rule of reason analysis to the instant factual situation.

We turn next to the issue of whether an antitrust determination can be made from the facts currently before this Court.

In *Muko II, supra,* 670 F.2d 421, the rule of reason determination was made by a jury after a full trial. Although the *Muko II* Court is silent on whether a rule of reason analysis could be made without a trial, it has noted that such an inquiry mandates a detailed examination of both the "affected business" and the "nature of the restraint imposed." *Id.* at 428.

In similar connection, Mr. Justice Brandeis, in *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), articulated his now classic statement concerning the rule of reason:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because good

intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret fact and to predict consequences.

*Id.* at 238, 38 S.Ct. at 244.

Obviously, the record before this Court is not complete in this respect. Although the Industry movants have submitted various affidavits, these do not satisfactorily address the rule of reason considerations set forth initially by Mr. Justice Brandeis. Accordingly, this Court concludes that the Industry movants have not met their burden with respect to their antitrust claim and summary judgment on this claim is denied.

An appropriate Order will issue.

### ORDER

And now, this 21st day of February, 1984, in conformity with the foregoing Opinion, it is hereby ORDERED that the summary judgment motions of the Industry members based upon the illegality of the purchased-coal clause in the 1974, 1978 and 1981 Wage Agreements under 29 U.S.C. § 158(e) are GRANTED.

Since this Court finds the purchased-coal clause of 1974, 1978 and 1981 Wage Agreements violative of 29 U.S.C. § 158(e), the clause is unenforceable and void and therefore its enforcement is permanently enjoined.

Additionally with respect to the Industry movants under 29 U.S.C. § 158(e) which are Plaintiffs, any and all counterclaims made against them seeking enforcement of the purchased-coal clause and contributions to the Funds are DISMISSED. In connection with those Industry member Defendants seeking only injunctive relief under 29 U.S.C. § 158(e), judgment on their respective 29 U.S.C. § 158(e) counterclaims and/or Affirmative Defenses is GRANTED and the respective actions against them are DISMISSED.

With respect to the Trustees in C.A. No. 83–0069, their motion for summary judgment which seeks contributions to the Funds is DENIED.

Further, it is hereby ORDERED that the motions of various Industry members seeking summary judgment based upon the illegality of the purchased-coal clause in the 1974, 1978 and 1981 Wage Agreements under 15 U.S.C. § 1 are DENIED.

However, with respect to those Industry movants seeking antitrust damages and damages under 29 U.S.C. § 158(e),[1] liability under the Sherman Act as well as damages under the Sherman Act and the National Labor Relations Act will be explored at trial. With respect to these three actions only, the parties are to submit to the Court a statement of outstanding discovery and a proposed discovery deadline. The above must be filed by March 8, 1984. All other actions are DISMISSED.

---

**1.** Duquesne (C.A. No. 81–870) and Associated (C.A. Nos. 83–2060 and 83–2626).