Harrison COMBS, et al., Plaintiffs,

v.

ASSOCIATED ELECTRIC
COOPERATIVE, INC.,
Defendants.

ASSOCIATED ELECTRIC
COOPERATIVE, INC.,
Plaintiffs,

v.

INTERNATIONAL UNION, UNITED
MINE WORKERS OF AMERICA,
et al., Defendants.

Civ. A. Nos. 83–1108, 89–1480.

United States District Court,
District of Columbia.

Dec. 7, 1990.

Daniel I. Booker, Michael E. Lowenstein, Carole S. Katz, Pittsburgh, Pa., and John M. Wood, Ellen R. Locker, Washington, D.C., Reed Smith Shaw & McClay, Eugene E. Andereck, Stockard, Andereck, Hauck, Sharp & Evans, Springfield, Mo., for Associated Elec.

Barbara J. Hillman, Mark S. Stein, Cornfield and Feldman, Chicago, Ill., Earl V. Brown, Jr., Washington, D.C., for United Mine Workers.

Stephen J. Pollak, Wendy S. White, Julie M. Edmond, Elizabeth M. Brown, Shea & Gardner, David W. Allen, Margaret M. Topps, Washington, D.C., for trustees.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter comes before the Court on the motion of defendant United Mine Workers of America ("UMWA") for summary judgment on Count II of the complaint of Associated Electric Cooperative, Inc. ("AECI"). The issue presented by this motion is whether UMWA is exempt from damages for potential antitrust violations arising from the collective bargaining agreement between UMWA and signatory employers, including AECI. The Court

finds that UMWA should be exempted from antitrust damages and will grant UMWA's motion.

## I.  Background

AECI was a signatory to the 1978, 1981, and 1984 National Bituminous Coal Wage Agreements ("NBCWA") and is currently a signatory to the 1988 NBCWA.[1] The terms of the NBCWA require that signatory employers make payments to the UMWA Health and Retirement Funds based upon the amount of coal produced by each employer.  Article XX(d)(1)(v) of the NBCWA ("the purchase-of-coal clause") also requires signatories to make payments to the Funds on purchased coal, unless royalties on that coal have previously been paid by the coal operators who produced the coal.[2]

AECI owns and operates two power plants, known as the Thomas Hill and New Madrid plants.  AECI became a party to the NBCWAs in January 1, 1980, when it assumed ownership and operation of coal mines adjacent to its Thomas Hill facility. Because these mines produce less than thirty percent of the coal required to operate the AECI power plants, AECI is forced to purchase a significant amount of coal from other coal producers.

In 1983, the Trustees of the UMWA Funds commenced this litigation against AECI, alleging that AECI had failed to pay royalties on coal purchased for its New Madrid plant.  On January 10, 1983, the Judicial Panel on Multidistrict Litigation consolidated fifteen cases, including this case, involving the purchase-of-coal clause of the NBCWA in the United States District Court for the Western District of Pennsylvania.  *In re Bituminous Coal Wage Agreements Litigation,* 580 F.Supp. 670, 673 (W.D.Pa.1984), *vacated and remanded,* 756 F.2d 284 (3d Cir.), *cert. denied,* 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985).

In the multidistrict litigation, AECI and several other employers moved for partial summary judgment on the ground that the purchase-of-coal clause was illegal under § 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(e).[3] 580 F.Supp. at 673–74.  AECI also claimed that the clause violated § 1 of the Sherman Act, 15 U.S.C. § 1,[4] and sought injunctive relief and damages[5] under the federal antitrust

---

**1.** Because the relevant provisions of the 1978, 1981, 1984, and 1988 Agreements are identical, the Agreements will be referred to collectively as "the NBCWA."

**2.** Article XX(d)(1)(v) of the NBCWA provides in part:

> [E]ach signatory Employer shall, for the periods of time indicated below, contribute to the Trusts established in this Article in the amounts shown below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal after production by another operator, procured or acquired by such Employer for use or for sale on which contributions to the appropriate Trusts as provided by this Article have not been made ...

**3.** Section § 8(e) of the NLRA provides provides in part:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any

other employer, or to cease doing business with any person, and any contract or agreement entered into heretofore or heretoafter containing such an agreement shall be to such extent unenforceable and void ...

29 U.S.C. § 158(e).

**4.** Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.  Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

**5.** Section 4 of the Clayton Act, 15 U.S.C. § 15, provides for private causes of action based upon violations of § 1 of the Sherman Act.

laws.[6] UMWA responded that it was exempt from antitrust damages under the rule announced by the Third Circuit in *Consolidated Express, Inc. v. New York Shipping Ass'n* (*Conex*), 602 F.2d 494, 521 (3d Cir.1979), *vacated and remanded on other grounds*, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980), *on remand*, 641 F.2d 90 (3d Cir.1981).

The District Court, per Judge Mansmann, granted the employers' motion for partial summary judgment based on the labor law issues, holding that the purchase-of-coal clause on its face violated § 8(e) of the NLRA. 580 F.Supp. at 681. Turning to the antitrust claims, the Court found that UMWA had failed to show that it was entitled to the *Conex* exemption from damages liability. The Court also held, however, that the finding of a § 8(e) violation does not establish a *per se* antitrust violation and that the available facts pertaining to the antitrust claims did not warrant summary judgment on behalf of the employers. *Id.* at 685–87.

Prior to trial on the antitrust issues, the ruling of the District Court was certified for appeal pursuant to 28 U.S.C. § 1292(b). The Third Circuit disagreed with the findings of the District Court on the labor law issues, holding that the purchase-of-coal clause did not, on its face, violate § 8(e). 756 F.2d at 291. The Circuit left open the possibility that an "as applied" violation of § 8(e) might be found on remand. As for the antitrust claims, the Court declined to "meet those issues" because "[t]he outcome of the individual cases may moot the antitrust claims." *Id.* at 293. The Circuit Court then vacated the judgments of the District Court and remanded for further proceedings. *Id.*

Upon remand, this case was returned to the United States District Court for the District of Columbia for trial on the remaining issues. UMWA has once again moved for summary judgment on AECI's claim for antitrust damages (Count II of AECI's complaint) on the grounds that it is exempt from such damages under *Conex.* AECI opposes the motion, arguing that the *Conex* exemption is not available in the District of Columbia Circuit and that, even assuming *Conex* is applicable, UMWA has failed to make a satisfactory showing that it is entitled to that exemption.[7]

II. The "nonstatutory" labor exemption

Labor unions are statutorily exempted from the reach of the federal antitrust laws under §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, and under the Norris–LaGuardia Act, 29 U.S.C. §§ 104, 105, and 113. *Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616, 621–22, 95 S.Ct. 1830, 1834–35, 44 L.Ed.2d 418 (1975). These statutes declare that labor unions are not combinations or conspiracies in restraint of trade, and they exempt certain union activities, including secondary picketing and boycotts, from the operation of the antitrust laws. *Id.* (citation omitted). These statutory exemptions protect only the unilateral actions of the union, however; they do not exempt concerted actions or agreements between unions and nonlabor parties. *Id.* at 622, 95 S.Ct. at 1835. Because the basis of AECI's complaint under the antitrust laws is the collective bargaining agreement between UMWA and the signatory employers, UMWA is not entitled to, nor does it argue for, any of the statutory exemptions.

The Supreme Court has also recognized a limited nonstatutory exemption to the federal antitrust laws in situations when the statutory exemptions are not available. The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate

---

6. AECI had also sought damages under § 8(e) of the NLRA, but it withdrew its claim for damages under the federal labor laws while this case was pending before the District Court for the Western District of Pennsylvania. *In re Bituminous Coal Wage Agreements Litigation,* M.D.L. 539, Misc. No. 9604 (W.D.Pa. June 15, 1987) (Order).

7. UMWA also seeks summary judgment on the ground that AECI has failed to produce evidence demonstrating that it suffered injury as a result of the purchase-of-coal clause. Given the resolution of the other issues raised by UMWA's motion, the Court will decline to address the issues concerning the sufficiency of the evidence of AECI's injury.

competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions. *Connell,* 421 U.S. at 622, 95 S.Ct. at 1835 (citing cases); *see also Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 688–90, 85 S.Ct. 1596, 1601–02, 14 L.Ed.2d 640 (1965). This nonstatutory exemption is only available when the concerted union and nonlabor actions are in furtherance of legitimate union objectives and when the restraints on trade are merely incidental disadvantages of efforts to achieve those objectives. *See Connell,* 421 U.S. at 623, 95 S.Ct. at 1835 ("[c]urtailment of competition based on efficiency is neither a goal of federal labor policy nor a necessary effect of the elimination of competition among workers"). "[T]he nonstatutory exemption offers no ... protection when a union and a nonlabor party agree to restrain competition in a business market." *Id.* at 622–23, 95 S.Ct. at 1835.

Because *Connell* involved a restraint on trade that did not further a legitimate union goal, *id.* at 625–26, 95 S.Ct. at 1836–37, the Supreme Court had no occasion to define those labor practices that would qualify for the nonstatutory exemption. That task has been left primarily to the lower federal courts, and, although the District of Columbia Circuit has recognized the exemption set forth in *Connell,* it also has not had opportunity to further develop that exemption. *See, e.g., Mullins v. Kaiser Steel Corp.,* 642 F.2d 1302, 1307 n. 5 (D.C. Cir.1980), *rev'd on other grounds,* 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982);

*International Longshoremen's Ass'n, AFL–CIO v. NLRB,* 613 F.2d 890, 906 (D.C. Cir.1979), *aff'd,* 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980); *Pacific Maritime Ass'n v. Federal Maritime Comm'n,* 543 F.2d 395, 403–04 (D.C.Cir.1976), *rev'd on other grounds,* 435 U.S. 40, 98 S.Ct. 927, 55 L.Ed.2d 96 (1978).

The nonstatutory labor exemption has been applied in this District in *Zimmerman v. National Football League,* 632 F.Supp. 398 (D.D.C.1986) (Parker, J.). In *Zimmerman,* the parties agreed that the defendant union's entitlement to a nonstatutory exemption from the antitrust laws should be governed by the Eighth Circuit decision in *Mackey v. National Football League,* 543 F.2d 606 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).[8] Judge Parker, after reviewing Supreme Court precedent in the *Connell* line of cases, agreed that *Mackey* adequately accommodated the sometimes conflicting policies of federal antitrust and labor law, *Zimmerman,* 632 F.Supp. at 403, and found that the defendant union, having satisfied the *Mackey* test, could not be held liable under the antitrust laws for the anticompetitive effects of its collective bargaining agreement. *Id.* at 408.

■ UMWA now argues before this Court that it should be exempted from antitrust liability under the Third Circuit decision in *Conex.* Like *Mackey, Conex* seeks to flesh out the nonstatutory exemption developed by the Supreme Court in *Connell* and *Jewel Tea. Conex,* 602 F.2d at 517–18. The *Conex* Court concludes that, to properly accommodate labor and antitrust policies, a distinction must be drawn between actions seeking declaratory or injunctive relief and actions seeking damages. In the former case, no federal labor policy is served by exempting from the antitrust laws an agreement found to be illegal under the labor laws. *Id.* at 519. Thus, "a finding that an agreement vio-

---

**8.** In *Mackey,* the Eighth Circuit developed a three-part test to determine whether a labor union is entitled to the nonstatutory exemption to the federal antitrust laws: (1) The trade restraint must primarily affect only the parties to the collective bargaining relationship; (2) the agreement must concern a mandatory subject of collective bargaining; and (3) the agreement must be the product of bona fide, arm's-length bargaining. 543 F.2d at 614 (citations omitted).

lates § 8(e) should always remove the antitrust exemption." *Id.*

Actions for antitrust damages are more complex, however. Although provisions of a collective bargaining agreement may be found illegal, "it is possible that at the time when the negotiating session took place the parties reasonably believed that their agreement was directly related to the lawful goal of work preservation." 602 F.2d at 520. Moreover, federal labor law seeks to protect not only the agreement itself, but also the collective bargaining *process.* *Id.* Thus, the Third Circuit concluded that to protect the union's ability (and willingness) to participate in that process, the union must be granted a limited immunity from antitrust damages in cases when the object of good faith collective bargaining is later found to be illegal. Unions are entitled to such an exemption when: (1) "at the time they acted ... they could not reasonably have foreseen that the subject matter of the agreement being challenged would be held unlawful under § 8(b)(4) or § 8(e);" (2) "the contract provisions and steps taken to implement them were 'intimately related' to the object of collective bargaining thought at the time to be legitimate;" and (3) the contract provisions and steps taken to implement them "went no further in imposing restraints in the secondary market than was reasonably necessary to accomplish [the object of collective bargaining]." *Id.* at 521; *see also Feather v. United Mine Workers of America,* 711 F.2d 530, 542 (3d Cir.1983) (reaffirming and reviewing application of *Conex* exemption).

AECI opposes the application of *Conex* to the facts of this case. AECI argues that *Conex* is not the law in this Circuit and is not available to UMWA in this action. AECI contends that Judge Parker's decision in *Zimmerman* "adopted" the approach of the Second Circuit in *Commerce Tankers Corp. v. National Maritime Union,* 553 F.2d 793 (2d Cir.), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977), which does not provide for the limit-ed nonstatutory exemption defined by *Conex.*[9]

The Court disagrees with AECI's characterization of the law in this Circuit. First, AECI mischaracterizes the *Zimmerman* decision when it argues that that decision "adopted" *Commerce Tankers.* In *Zimmerman,* the plaintiff argued that the District Court should first determine whether a collective bargaining agreement violates § 8(e), and, if it finds that it does, hold the labor exemption inapplicable to such an agreement. 632 F.Supp. at 404. The District Court responded to that argument by finding that the Supreme Court had never adopted such an analysis. Instead, the Supreme Court has held that a finding of a § 8(e) violation does not eliminate the need for an inquiry into whether the antitrust exemption applies. *Id.* Indeed, were the agreement valid under § 8(e), the antitrust exemption might not even be necessary. *Zimmerman* cites *Commerce Tankers* (in a footnote) merely as precedent supporting the position that a finding of a § 8(e) violation does not obviate the need for an inquiry into the availability of the nonstatutory exemption. *Id.* n. 6; *see Commerce Tankers,* 553 F.2d at 801–02 ("we do not believe that our prior holding that the clause violated § 8(e) necessarily determines th[e] antitrust issue ..."). *Zimmerman* did not adopt *Commerce Tankers,* and it certainly did not, as AECI suggests, reject *Conex.*

Second, even assuming that *Zimmerman* did "adopt" *Commerce Tankers,* it is unclear what was adopted. *Commerce Tankers* held that the validity of a collective bargaining agreement is subject to separate labor and antitrust inquiries. 553 F.2d at 801–02. Yet this still leaves the Court with the fundamental question presented by this motion, namely, how to implement the nonstatutory exemption set forth by the Supreme Court in *Connell? Commerce Tankers* provides the Court with no such guidance, nor does AECI sug-

---

**9.** Although not necessary to its ruling in this matter, the Court rejects any inference in AECI's argument that the *Zimmerman* decision is bind-ing on the District of Columbia Circuit or on this Court.

gest an alternative analysis to that of *Conex*.[10]

UMWA is entitled to have this Court consider their claim of exemption from antitrust liability. *Connell* makes such protection available to labor unions. In order for this Court to decide the availability of the exemption, however, the Court must utilize some analysis that reflects the policy concerns underlying the nonstatutory exemption. As discussed *supra*, the *Conex* analysis is derived from and furthers the federal labor policy of encouraging collective bargaining while simultaneously ensuring that agreements that do not further legitimate labor goals are not allowed to act as restraints on competition. The Court finds that the *Conex* analysis has not been rejected in this Circuit and that AECI has neither proposed an alternative analysis nor demonstrated that the *Conex* test is inadequate or inappropriate for evaluating UMWA's entitlement to the nonstatutory exemption. For these reasons, and because the Court is persuaded by the reasoning of the Third Circuit, the Court will proceed to apply the *Conex* test to the facts of this case.

### III. The *Conex* labor exemption

In order for UMWA to qualify for the nonstatutory exemption to antitrust liability, it must satisfy the three prongs of the *Conex* test.[11] The first element of the nonstatutory exemption is that UMWA "could not reasonably have foreseen that the [purchase-of-coal clause] would be held to be unlawful under ... § 8(e)." *Conex*, 602 F.2d at 521. The Court finds ample evidence from which it concludes that the clause was not foreseeably illegal at the time UMWA entered into the NBCWA. Most helpful to UMWA is the opinion of the Third Circuit in the multidistrict litigation involving this case. That Court rejected the signatory employers' argument that the purchase-of-coal clause violated § 8(e) as a matter of law, holding that "the prohibited secondary objective is not revealed by the language of the collective bargaining agreement here, ..." *Bituminous Coal*, 756 F.2d at 291. Although the Court left open the possibility of the District Court finding an "as applied" violation of § 8(e) on remand, its conclusion that the clause was not illegal on its face weighs heavily against this Court finding that the clause was foreseeably illegal at the time UMWA entered into the NBCWA.

The purchase-of-coal clause and its predecessors have also been the subjects of extensive litigation prior to the present action. *See Bituminous Coal*, 756 F.2d at 288–89 (summarizing previous litigation). The clause first appeared in the NBWCA as the protective wage clause, which prohibited signatory employers from purchasing coal from mine operators whose employees worked under conditions less favorable than those in the 1958 collective bargaining agreement.[12] *Id.* at 288. The Na-

---

**10.** The Second Circuit has not expressly adopted a test for the nonstatutory exemption, but it has discussed the requirements for the exemption that can be derived from Supreme Court precedent. *Local 210, Laborers' Int'l Union of N. Am. v. Labor Relations Div. Assoc. Gen. Contractors*, 844 F.2d 69, 79–81 (2d Cir.1988). The Circuit concluded for a collective bargaining agreement to receive the exemption:

"First, the agreement at issue must further goals that are protected by national labor law and that are within the scope of traditionally mandatory subjects of collective bargaining. Second, the agreement must not impose a 'direct restraint on the business market [that] has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions [that results from collective bargaining agreements].'"

*Id.* at 79–80 (citations omitted). The Second Circuit cites *Conex* in support of both prongs of this "test," undermining AECI's argument that Second Circuit case law is inconsistent with *Conex*.

**11.** UMWA bears the burden of proving the elements of the *Conex* exemption on this summary judgment motion. *See Conex*, 602 F.2d at 521 ("the defendants have the burden on all elements of going forward and of persuasion").

**12.** The protective wage clause of the 1958 NBCWA read in part:

It is recognized that when signatory operators mine, prepare, or procure or acquire under subcontract arrangements, bituminous coal mined under terms and conditions less favorable than those provided for in this contract, they deprive employees of employment opportunities, employment conditions and other

tional Labor Relations Board ("NLRB") held that clause illegal under § 8(e), *Raymond O. Lewis*, 144 NLRB 288, 237–38 (1963), but that decision was vacated by this Circuit, which found that such a "union standards" clause would not ordinarily violate § 8(e). *Lewis v. NLRB*, 350 F.2d 801, 801–02 (D.C.Cir.1965). The NLRB later upheld the protective wage in *W.A. Boyle*, 179 NLRB 479 (1969), *appeal dismissed*, 468 F.2d 1139 (D.C.Cir.1972).

In the interim, the protective wage clause was replaced by the "80–cent clause," which required signatory employers to contribute to the UMWA Funds eighty cents per ton on coal purchased from a non-signatory but only forty cents per ton on coal purchased from a signatory producer. The NLRB also initially held the 80–cent clause illegal under § 8(e), *Raymond O. Lewis*, 148 NLRB 249 (1964), only to again be reversed by this Circuit in *UMWA v. NLRB*, 399 F.2d 977 (D.C.Cir. 1968). On remand, the NLRB found the clause to be valid. *UMWA (Dixie Mining)*, 188 NLRB 753 (1971).

The 80–cent clause was replaced by the purchase-of-coal clause following the Sixth Circuit decision in *Riverton Coal Co. v. UMWA*, 453 F.2d 1035 (6th Cir.), *cert. denied*, 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972). *Riverton* held the 80–cent clause to be illegal under § 8(e), but, as recognized by *Bituminous Coal*, 756 F.2d at 292, that holding was based upon evidence at trial that the union had designed the 80–cent clause for the illegal secondary purpose of pressuring the employer's affiliates to recognize the UMWA. As noted by the Third Circuit, the *Riverton* decision was not inconsistent with the *Bituminous Coal* finding that the various

> benefits which these employees are entitled to have safeguarded, stabilized, and protected. Accordingly, the Operators agree that all bituminous coal mined, produced, or prepared by them, or any of them, or procured or acquired by them or any of them under a subcontract arrangement, shall be or shall have been mined or produced under terms and conditions which are as favorable to the employees as those provided for in this Contract.

*Lewis v. NLRB*, 350 F.2d 801, 801–02 n. 1 (D.C. Cir.1965).

union standards clauses of the NBCWA were not facially illegal. *Id.*

The NLRB had the opportunity to consider the validity of the purchase-of-coal clause in 1979. Responding to a charge that the clause violated § 8(e), the NLRB refused to issue an unfair labor practice complaint, finding that "Article XX, Section (d)(1)(v) of the 1978 [NBCWA] ... is on its face, a lawful work preservation/union standards clause rather than a clause violative of Section 8(e) of the [National Labor Relations] Act." (Letter from Henry Shore, Regional Director of the NLRB, to Consolidated Coal Company) (Feb. 28, 1979). As authority for this decision, the NLRB relied upon its *Dixie Mining* decision, which had upheld the predecessor protective wage clause. *Id.*

The validity of the purchase-of-coal clause has also been addressed by the District Court for the Western District of Pennsylvania. *Copper Valley Coal Co. v. UMWA*, Civ. No. 86–899, 1990 WL 253224 (Nov. 8, 1990) (Bloch, J.) (Mem.Op.). Judge Bloch, relying on much of the same evidence presented before this Court, found that the clause satisfied the first prong of the *Conex* test. "[T]he illegality of the clause was not foreseeable during the 1981 negotiations, or in 1982 or 1983." Mem.Op. at 6.

One case in this Circuit has also touched upon the issue of the validity of the purchase-of-coal clause. In *Mullins v. Kaiser Steel Corp.*, 642 F.2d 1302 (D.C.Cir.1980), this Circuit refused to enjoin enforcement of the purchase-of-coal clause under the antitrust or labor laws. Although the decision did not turn on the merits of the antitrust or labor law claims,[13] the Court noted that

**13.** The *Mullins* decision did not turn upon whether the purchase-of-coal clause violated the antitrust or labor laws, although both claims were presented by the appellant. The Sherman Act claim was rejected because the appellant's employees had fully performed their obligations under the labor contract while the appellant had ignored its contractual duty to contribute to the union benefits funds and had failed to seek a timely adjudication of its rights. 642 F.2d at 1309–13. The Circuit rejected appellant's labor law claim because the appellant had not first sought an unfair labor practice charge with the

[t]here is, in fact, good reason to think that the purchase-of-coal clause is consistent with both federal antitrust and federal labor law.... Over the years, courts have drawn under the ambit of the labor exemption to the antitrust laws union protective devices having much greater anticompetitive effects than the purchase-of-coal clause here under review.

*Id.* at 1307 n. 5 (citations omitted).

Given the bulk of authority supporting the validity of the purchase-of-coal clause, UMWA could justifiably have concluded that the clause was and would be found to be legal at the time it negotiated for its inclusion in the NBCWA. Yet AECI raises two arguments against such a finding that merit discussion.

AECI first argues that the District Court in the multidistrict litigation found that the purchase-of-coal clause *was* foreseeably illegal, *Bituminous Coal*, 580 F.Supp. at 684, and that because the Third Circuit never addressed the antitrust issues on appeal, 756 F.2d at 293, the District Court opinion is the law of the case with respect to those issues. The problem with AECI's argument is that the Third Circuit did not merely reverse the finding of the District Court on the labor law issue (which the Circuit did address), but it expressly vacated the *"judgments* of the district court" and remanded for further proceedings. *Id.* Further, the District Court's finding of foreseeable illegality must be read in conjunction with its finding that the purchase-of-coal clause violated § 8(e) on its face. Although a facially invalid contractual provision is likely to be foreseeably illegal, the potential illegality of a facially valid clause is unlikely to be foreseen at the time it is negotiated. The Third Circuit's holding that the purchase-of-coal clause is not foreseeably illegal therefore undermines the basis of the District Court findings regarding the first prong of the *Conex* exemption. For these reasons, the Court cannot rely on that District Court decision.

■ AECI also relies on the presence of a "savings clause" accompanying the purchase-of-coal clause.[14] This clause provides for the severability of the purchase-of-coal clause from the remainder of the NBCWA and for renegotiation of that clause in the event it is held to be invalid in its present form. AECI maintains that the savings clause is proof that the purchase-of-coal clause "contemplates its own illegality." AECI Opposition at 4. The Court disagrees with AECI and finds that the savings clause does not prove that the purchase-of-coal clause was foreseeably illegal at the time it was negotiated. AECI's reading of the savings clause proves too much, for such an argument can be made with respect to every statute or contract containing such a clause. The Court finds that the savings clause was a logical and prudent safeguard against established variances in NLRB decisions concerning the legality of the purchase-of-coal clause and its predecessors. The savings clause also serves to preserve the NBCWA in the event that the purchase-of-coal clause is found to violate § 8(e) as applied, as was the case in *Riverton.* AECI seeks to have this Court read *Conex*'s prong of "foreseeably illegal" to mean "possibly" or "potentially" illegal. The Court rejects such a

---

NLRB. 642 F.2d at 1313–18. The Supreme Court reversed the *Mullins* decision, holding that the appellant was entitled to have the District Court hear its defenses concerning the illegality of the labor contract. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982).

**14.** Article XX(d)(1)(v)(d) of the NBCWA provides:

The parties hereto mutually agree that, if at any time during the term of this Agreement a court or tribunal of competent jurisdiction determines by a final decision that is not appealable that the provision appearing in paragraph (v) [the purchase-of-coal clause] just preceding is invalid or in violation of the National Labor Relations Act, 1947, as amended, or other Federal or state law, the parties shall, at the option of and upon demand by the Union without affecting the integrity of any other provision of this Section or any other provision of the National Bituminous Coal Wage Agreement, meet and engage in good faith negotiations to agree upon a clause to be inserted into this Agreement in replacement of the provision found invalid or unlawful.

reading and finds that the presence of the savings clause does not render the purchase-of-coal clause foreseeably illegal.[15]

Upon consideration of all of the factors discussed above, the Court finds that UMWA has satisfied the first prong of the *Conex* test because it could not have reasonably foreseen at the time it entered into negotiations with the signatory employers that the purchase-of-coal clause might be held to be unlawful under § 8(e).

The second element of the *Conex* test requires that "the contract provisions and the steps taken to implement them were 'intimately related' to the object of collective bargaining thought at the time to be legitimate." 602 F.2d at 521. This requirement is derived from the Supreme Court decision in *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), which held that

> [the nonstatutory] exemption for union-employer agreements is very much a matter of accommodating the coverage of the Sherman Act to the policy of the labor laws. Employers and unions are required to bargain about wages, hours and working conditions, and this fact weighs heavily in favor of antitrust exemption for agreements on these subjects.

*Id.* at 689, 85 S.Ct. at 1601. Thus, for a union-employer agreement to qualify for the nonstatutory labor exemption, the subject matter of that agreement must be

> so *intimately related* to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor policies, and not at the behest of or in combination with nonlabor groups, falls

within the protection of the national labor policy and is therefore exempt from the Sherman Act.

*Id.* at 689–90, 85 S.Ct. at 1602 (emphasis added) (footnote omitted). Because an employer's subcontracting out work capable of being performed by its union employees is a "condition of employment," *Fibreboard Paper Prod. Corp. v. NLRB*, 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964), the only issue to be resolved by this Court is whether the purchase-of-coal clause is "intimately related" to the union objective.

It is apparent on the face of the purchase-of-coal clause that it is designed to further union interests. The Third Circuit recognized that "[s]uch a clause permissibly protects the employer's own workers since the non-union firm will not be able to offer lower prices based on sub-union wage and benefit standards." *Bituminous Coal*, 756 F.2d at 290. The Circuit further reasoned that even a clause found to violate § 8(e) as applied will provide the union workers the same protection as would a valid union standards clause. *Id.* (union signatory clause requiring employer to subcontract only with unionized firms, although illegal under § 8(e), provides same benefits to union members as legal union standards clause).

In the *Copper Valley* case, *supra*, Judge Bloch denied UMWA summary judgment under the second prong of the *Conex* test. Judge Bloch reasoned that defendants' objectives were not apparent from the language of the purchase-of-coal clause or the evidence before the District Court. Mem.Op. at 7. *Copper Valley* reasoned that "[t]he determinative factor in assessing the legitimacy of the defendants' objec-

---

**15.** The plaintiffs in *Copper Valley* recently moved for reconsideration of that decision and, for the first time, argued that the savings clause of NBCWA Article XX proved the foreseeable illegality of the purchase-of-coal clause. Judge Bloch found that argument to be "without merit," holding that

> [a]lthough Article XX is indicative of an awareness by the parties that a judicial determination of illegality is a possibility, Article XX does not demonstrate that at the time of the agreement formation the parties could

have reasonably foreseen the clause to be unlawful. A judicial determination of illegality is always a possibility. However, under the antitrust exemption, the test is not whether the parties contemplated the possibility of a judicial determination declaring the provision invalid, but instead is whether, at the time of the agreement formation, the parties could have reasonably foreseen that the clause in question violates federal law.

*Copper Valley Coal Co. v. UMWA*, Civ. No. 86–899, at 1–2 (Dec. 4, 1990) (Bloch, J.) (Order).

tives is whether the purchased-coal clause was designed to preserve the work of the bargaining unit, or instead was 'tactically calculated to satisfy union objectives' regarding non-signatory employers." *Id.* at 6–7.

This Court disagrees with the *Copper Valley* interpretation of the second *Conex* prong. *Conex* requires that the clause be intimately related to the "object of collective bargaining thought at the time to be legitimate." 602 F.2d at 521. Under the *Copper Valley* decision, the requirement of intimate relation to a union objective becomes an inquiry into the legality of that objective at the time it was implemented. But whether the clause, and therefore the union objective, was foreseeably illegal has already been addressed in the first *Conex* prong. Thus, the illegality of the provision is not the relevant inquiry. The proper issue under the second *Conex* prong is whether the purchase-of-coal clause is sufficiently related to the union goal, already determined to be legal at the time of negotiations, so as to further that *union* goal and not the goal of the employer. *See Jewel Tea*, 381 U.S. at 690, 85 S.Ct. at 1602 (union entitled to nonstatutory exemption when collective bargaining provision "is not at behest of or in combination with nonlabor groups").

This Court can find no employer purpose furthered by the purchase-of-coal clause. Indeed, the basis of AECI's complaint is that the clause serves to increase the purchase price of coal and to force non-signatory coal operators to unionize, which would strengthen UMWA's control over the labor market and presumably further increase coal prices. The Court finds that the purpose of the clause is to preserve union work by preventing signatory employers from purchasing non-union coal at cheaper prices.

AECI argues that the purchase-of-coal clause "is purely and simply a surtax on the price ... of coal ... [which] is a direct restraint on the product market and directly impedes the ability of non-signatories to compete" in the coal market. AECI Opposition at 19. This argument misses the point of the second *Conex* prong, however. The fact that the clause may have anticompetitive effects is envisioned by *Conex;* indeed, *Conex* is intended to insulate unions from liability when their actions violate the antitrust laws. Thus, the negative effects of the clause on the employer or on the product market are not sufficient to create an issue of fact under the second element of *Conex.* Rather, AECI must present some evidence that the purchase-of-coal clause either does not serve a union purpose or that it does serve an employer purpose. *See Jewel Tea*, 381 U.S. at 690 n. 5, 85 S.Ct. at 1602 n. 5 (employer-union agreement entitled to nonstatutory exemption even though it facially created a price-fixing scheme, because agreement served union interest of protecting employee wage scale) (citing *Local 24, Int'l Bhd. of Teamsters v. Oliver*, 358 U.S. 283, 293–94, 79 S.Ct. 297, 303–04, 3 L.Ed.2d 312 (1959)). Because AECI does not present any evidence that the purchase-of-coal clause does not further a union objective, and because UMWA presents evidence to show that it does, the Court is able to rule, on this motion for summary judgment, that UMWA has fulfilled its burden of showing that the clause is intimately related to the object of collective bargaining thought at the time to be legal.

The third and final prong of the *Conex* test is that the purchase-of-coal clause "went no further in imposing restraints in the secondary market than was reasonably necessary to accomplish" the union objectives. 602 F.2d at 521. The Court finds that the clause is sufficiently tailored to the third *Conex* requirement. As noted by Judge Bloch in *Copper Valley:*

> The clause is facially legal, and on its face does not impose impermissible restraints on the secondary market.... [T]he third prong ... does not require the clause to be absolutely narrowly tailored. The non-statutory exemption is applicable only if the purchased-coal clause is illegal due to its secondary effects. Requiring the clause to be absolutely narrowly tailored would in essence require the clause to be legal, thereby eviscerating the exemption in the present

case.... The purchased-coal clause does not impose restraints in the secondary market beyond those reasonably necessary to further the defendants' stated objective of work preservation.

Mem.Op. at 7–8. Thus, the third prong of *Conex* envisions that the challenged clause will have some secondary effects and does not require that those effects be eliminated in order for the nonstatutory exemption to apply.

UMWA argues quite persuasively that judicial and NLRB precedent establish that the purchase-of-coal clause is not invalid based upon its illegal secondary effects. Certainly the predecessors of the clause had no secondary effects prohibited by § 8(e). *See W.A. Boyle*, 179 NLRB 479 (1969) (protective wage clause does not violate § 8(e)); *Dixie Mining*, 188 NLRB 753 (1971) (80–cent clause does not violate § 8(e)). The Third Circuit has held that the purchase-of-coal clause does not, on its face, reveal prohibited secondary objectives. *Bituminous Coal*, 756 F.2d at 291. These decisions all make clear that the purchase-of-coal clause and its predecessors are reasonably tailored to preserving union employment, and, although they may have secondary effects, those effects do not undermine the reasonableness of the work preservation clauses.

AECI argues in opposition that UMWA "chose to ignore well-recognized work preservation provisions limited to protecting UMWA work opportunities from the threat of substandard competition." AECI Opposition at 19. AECI fails to specify what those other "well-recognized" provisions might be. Further, AECI fails to rebut UMWA's evidence that the purchase-of-coal clause is a reasonable restraint designed to further legitimate union objectives. AECI argues that the clause restrains all non-union competition, even if lower prices are based upon greater economic efficiencies in production and not upon non-union working conditions. The Court fails to see, and AECI fails to specify, how the clause could have been amended to factor in such distinctions and to only restrain competition based on sub-union working conditions. Such a provision likely would prove impos-

sible to implement, forcing the parties to the NBCWA to, as in this case, employ some reasonable compromise provision even if, in some situations, that provision serves to restrain competition based upon factors other than sub-union labor conditions. *Conex* requires only that the steps taken to implement the union objective be reasonable, not that they be the least restrictive means to achieve union goals. The Court concludes that UMWA has shown that the purchase-of-coal clause is reasonably necessary to its goal of work preservation and that this showing satisfies the third prong of the *Conex* test.

In conclusion, the Court finds that the UMWA has satisfied its burden of proving the elements of the *Conex* nonstatutory exemption to the antitrust laws. The Court thus holds that UMWA motion for partial summary judgment will be granted and that UMWA will be exempted from damages liability under the federal antitrust laws.

## IV. Conclusion

For the foregoing reasons, the Court finds that UMWA is entitled to the nonstatutory exemption to antitrust damages liability provided in *Conex* and will grant UMWA's motion for summary judgment on count II of AECI's complaint.